**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

KLOPOTEK NORTH AMERICA, INC.,   )
                                    )
         Plaintiff,         )
                                    )   Case No.
THE    TRUSTEES    OF    INDIANA)
UNIVERSITY,  on  behalf  of  INDIANA)
UNIVERSITY PRESS,                  )

         Defendant.

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, Klopotek North America, Inc., by and through its attorneys Lewis Brisbois Bisgaard & Smith LLP, for its Complaint for Declaratory Relief against Defendant, The Trustees of Indiana University on behalf of Indiana University Press, states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      At all relevant times, Klopotek North America, Inc. ("Klopotek") was a software company incorporated under New York law, with its principal place of business in Parsippany, New Jersey.

2.      The Trustees of Indiana University, acting on behalf of Indiana University Press ("IUP), is an Indiana political subdivision and, thus, is a citizen of Indiana. Indiana Code § 21-20-2-2.

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 by virtue of the parties' diversity of citizenship and the fact that the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to this suit occurred in this district, namely that Klopotek

1

negotiated the contract with IUP from its headquarters in Parsippany, New Jersey, and performed some of the services under the contract from its headquarters.

5.      This lawsuit seeks a declaratory judgment as well as a monetary judgment relating to a Software as a Service ("SaaS") agreement entered into between the parties. Declaratory judgment is sought pursuant to 28 U.S.C. § 2201.

## FACTUAL ALLEGATIONS

6.      IUP is an academic press established in 1950 that publishes books, 40 journals, and 3,500 titles. IUP specializes in humanities and social science and publishes approximately 140 new books annually in addition to 12 academic journals. IUP has claimed various awards for its publications around the world.

7.      IUP used a program called AllBooks as its title management system and CATS as its business system.

8.      Upon information and belief, AllBooks was being phased out to be discontinued.

9.      In 2015, IUP issued a request for proposal (RFP) to update its title management system and publishing intelligence system.

10.     On February 2, 2016, Klopotek submitted a proposal to IUP from its New Jersey office in response to the RFP to update the title management system using its Klopotek System, which is publishing software used globally by thousands of publishers. IUP accepted the proposal.

11.     On July 12, 2016, Klopotek and IUP entered into a contract under which Klopotek agreed to license its publishing software to IUP through SaaS (the "SaaS Agreement") and build the Klopotek System to meet IUP's needs. In return, IUP agreed to compensate Klopotek pursuant to Section 5 and Appendix 9 of the SaaS Agreement. (Exhibits 1 and 2).

12.     In November of 2016, the parties amended the SaaS Agreement for Klopotek to implement and procure its Order to Cash Module. (See Exhibit 3).

13.     Klopotek's SaaS system went live with 15 agreed to limitations on July 24, 2017.

14.     Klopotek and IUP held weekly meetings throughout the project. All task and issues were tracked and communicated in an open item summary report during those meetings. Additionally, to help facilitate and resolve issues that arose with the installation and implementations of the software, Klopotek introduced a web-based issue tracking tool, "Elementool" in November 2017. Elementool allowed both Klopotek and IUP to track and monitor all tasks. IUP could submit "tickets" for any issues it had with the software.

15.     A service Delivery Manager was also assigned to IUP to help in the tracking and closing out of issues. It was agreed that all issues IUP's users found with the system had to be reported on Elementool or Klopotek could not respond to or be aware of the alleged issues.

16.     During the project, certain issues did arise but IUP routinely failed to submit tickets in Elementool and failed to understand the true power of the Klopotek system.

17.     Upon information and belief, IUP's former system, AllBooks, issued a new, updated software system during the course of IUP's relationship with Klopotek.

18.     Upon information and belief, IUP preferred AllBooks because it was familiar with the system after having used it for years and sought to break its contract with Klopotek to revert back to using its old system.

19.     In a demand letter date October 3, 2019 (Exhibit 4), IUP terminated the SaaS Agreement, claiming that Klopotek breached the SaaS Agreement and made misrepresentations to IUP regarding the capabilities and functionality of the Klopotek System. IUP further claimed that

the System was not fully functional. IUP demanded a full reimbursement in the amount of $759,989.89, the sum of all payments made to Klopotek under the SaaS Agreement.

20.     The parties' counsel exchanged further correspondence and spoke by telephone several times following receipt of the demand letter.

21.     The SaaS Agreement contains a damages limitation clause, which provides, in relevant part:

**§11   Liability**

11.1  The Parties agree that:

11.1.1     BOTH PARTIES SHALL BE LIABLE FOR WILLFULNESS AND GROSS NEGLIGENCE IN ACCORDANCE WITH STATUTORY PROVISIONS.

11.1.2     THE LIABILITY AND OBLIGATION OF KLOPOTEK, IN THE AGGREGATE FOR ANY ALL CLAIMS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WITH RESPECT TO ANY COST, EXPENSE, DAMAGE, LOSS, INJURY, OR LIABILITY OF ANY KIND OR NATURE WHATSOEVER, REGARDLESS OF THE FORM OF ACTION OR THEORY OF LIABILITY (INCLUDING FOR BREACH OF CONTRACT, EQUITY, TORT, NEGLIGENCE, BY STATUTE OR OTHERWISE) SHALL BE LIMITED TO DIRECT DAMAGES AND SHALL NOT EXCEED **FIFTY THOUSAND DOLLARS ($50,000)**.

(Exhibit 1.)

22.     IUP disputes Klopotek's contention that the damages limitation clause applies to limit any damages to IUP to $50,000.

23.     The parties attempted to resolve the conflict between them in a full day mediation on September 23, 2020, in Indianapolis, Indiana, which was unsuccessful.

24.     The matters set forth in Paragraphs 19 through 23 are hereafter referred to as "the Parties' Dispute."

4

25.     In light of the Parties' Dispute, an actual and substantial controversy exists between parties having adverse legal interests, of sufficient immediacy and reality that warrants the issuance of a declaratory judgment as to whether IUP, if successful on its alleged claims, could recover more than the damages limitation in Section 11.1.1 and 11.1.2 of the SaaS Agreement.

26.     The amount in controversy is over the jurisdiction threshold because IUP seeks damages well in excess of $75,000 in its demand letter.

27.     Further, the SaaS Agreement states, in relevant part:

> 11.7   The Agreement shall be governed by the laws of the State of Indiana, and Klopotek shall at all times comply with and observe all federal, state and local laws, ordinances, and regulations which are in effect during the period of the Agreement and which in any manner affect the work or its conduct. Any party bringing a legal action or proceeding against any other party arising out of or relating to this Agreement may bring the legal action or proceeding in the United States District Court for the Southern District of Indiana or in the Monroe Circuit Court in Monroe County, Indiana.

(Exhibit 1.)

28.     To the extent IUP enjoyed any sovereign immunity, IUP waived it by assenting to Section 11.7, which contemplates legal action in Indiana or elsewhere (through the word "may"), and entering into the SaaS Agreement.

## COUNT I
### (Declaratory Judgment)

29.     Klopotek incorporates by reference paragraphs 1-28 as if fully stated herein.

30.     Prior to the signing of the SaaS Agreement, the parties engaged in negotiations and agreed upon the material contractual terms. For example, on June 16, 2016, David Hetherington of Klopotek emailed a copy of the proposed contract to IUP for their review and comments. (Exhibit 5.)

31.     Prior to the signing of the SaaS Agreement, IUP was fully aware that the proposed contract included the damages limitation clause. IUP never objected to or rejected its inclusion or proposed any amendments to it.

32.     Both parties intended that the damages limitation clause would apply to the SaaS Agreement.

33.     IUP signed and assented to the SaaS Agreement, including the damages limitation clause.

34.     The decision to limit payment relative to potential liability was made voluntarily, intelligently, and with knowledge of the legal consequences.

35.     The damages limitation clause is enforceable under applicable law and is binding on the parties.

36.     In light of the allegations above and attached exhibits, any damages for any cause of action, claim, or lawsuit by IUP against Klopotek that relates to the Parties' Dispute are limited to $50,000.00.

WHEREFORE, Klopotek North America, Inc. respectfully requests that this Court:

    a.     declare that the damages limitation clause set forth in Section 11.1.1 and 11.1.2 in the SaaS Agreement is enforceable and binding on the parties and any related persons and entities;

    b.     declare that the damages limitation clause set forth in Section 11.1.1 and 11.1.2 in the SaaS Agreement limits any damages for any cause of action, claim, or lawsuit between the parties (and any related persons and entities) that pertains to the Parties' Dispute to $50,000.00; and

    b.     grant any other relief this Court deems just and equitable.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

/s/ *Meredith Kaplan Stoma*

MEREDITH KAPLAN STOMA, ESQ. (026051991)

Meredith Kaplan Stoma (026051991)
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
One Riverfront Plaza, Suite 800
Newark, New Jersey 07102
Phone: (973)792-8739/Fax (973) 577-6261
Meredith.Stoma@lewisbrisbois.com
*Attorneys for Plaintiff*


Josh M. Kantrow (*pro hac vice* anticipated)
Thomas M. Wolf (*pro hac vice* anticipated)
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
550 West Adams Street, Suite 300
Chicago, Illinois 60661
Phone: (312) 345-1718 / Fax: (312) 345-1778
Josh.Kantrow@lewisbrisbois.com
Thomas.Wolf@lewisbrisbois.com
*Attorneys for Plaintiff*

# EXHIBIT 1

**klopotek.**

# SAAS AGREEMENT

## CONTRACT NUMBER SAAS-109260-2016

| | |
|---|---|
| **CONTRACT** | **01** |
| **VERSION** | **01** |

LICENSOR:

Klopotek North America, Inc.
2001 Route 46
Parsippany, New Jersey 07054
USA

hereinafter referred to as Klopotek

LICENSEE:

Trustees of Indiana University on behalf of the IU Press
1000 Waterway Blvd. Ste. 101
Indianapolis, IN 46202

hereinafter referred to as IUP

PROJECT:       SaaS provision of Klopotek Standard Software for Publishers

STATUS:       ~~DRAFT~~ / RELEASED

DM H.

**Exhibit 7**

# Table of Contents

Table of Contents ........................................................................................ 1

Preamble...................................................................................................... 2

§ 1    Definitions and Interpretations ....................................................... 2

§ 2    Subject of this SaaS Agreement ..................................................... 3

§ 3    Ownership and rights of use............................................................ 6

§ 4    Term and termination....................................................................... 7

§ 5    Fees and Payment ........................................................................... 8

§ 6    Co-operation and obligations of IUP ............................................... 9

§ 7    Support and Maintenance .............................................................. 10

§ 8    Updates and Upgrades ................................................................... 12

§ 9    Intellectual Property Rights............................................................ 13

§ 10   Warranties ...................................................................................... 14

§ 11   Liability ........................................................................................... 15

§ 12   Confidentiality ................................................................................ 16

§ 13   Additional services ......................................................................... 18

§ 14   Final provisions .............................................................................. 18

## Appendices

**All the Appendices listed here constitute an integral part of the contract.**

| Appendix 1 | SaaS System functionality scope chart |
| Appendix 2 | List of 3rd Party Software SaaS |
| Appendix 3 | License, Product Liability and Warranty Conditions of Third Party Software |
| Appendix 4 | Price List Klopotek SaaS |
| Appendix 5 | Whitepaper Hardware Configuration Workstation / SaaS remote access |
| Appendix 6 | Service Levels |
| Appendix 7 | Communication |
| Appendix 8 | Consulting Order Request |
| Appendix 9 | Pricing SaaS |
| Appendix 10 | Minimum Insurance Requirements |



## Preamble

Klopotek is the developer and owner of the Klopotek standard software for the publishing industry. IUP intends to use the Klopotek software by means of Software as a Service (SaaS) for its internal business purposes. This SaaS Agreement sets out the terms and conditions on which IUP has agreed that Klopotek shall provide the SaaS of the Klopotek software to IUP.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), Klopotek and IUP agree as follows:

## § 1      Definitions and Interpretations

1.1     "SaaS" ("Software as a Service") means the provision of software running on server hardware, at a place in Europe to be determined by Klopotek in its own discretion, to be accessed by IUP over an internet connection using terminal emulation software.

1.2     "Licensed Products" means the Klopotek standard software products providing the functionality specified in Appendix 1.

1.3     "Third Party Software" means the third party software products specified in Appendix 2.

1.4     "Software" means collectively the Licensed Products and the Third Party Software.

1.5     "SaaS System" means the Software and hardware provided by Klopotek by means of SaaS to IUP.

1.6     "Working Day" means 9 am to 5 pm (GMT-5.00 = Eastern Time) on any day in the State of New Jersey other than Saturday, Sunday or statutory holidays.

1.7     "Klopotek Price List" refers to Klopotek's current price list for "Klopotek SaaS" (Appendix 4). Any reference to the Klopotek Price List includes all future changes and updates of the price list as from time to time amended, changed or updated at Klopotek's sole discretion.

1.8     "Fault" means (1) any difference between the expected result set out in the documentation relating to the business transactions in question (Appendix 1 and product documentation, cf. Sec. 2.1.4) and the actual result achieved when processing the business transactions or (2) any failure (i.e. non-availability) of the SaaS System due to a default of Klopotek that results in IUP being unable to utilize the Licensed Products for the performance of business transactions.

1.9     Where there is any conflict or inconsistency between Clauses of this Agreement and any Schedule or Appendix, the provisions of Clauses of this Agreement shall prevail.

1.10    The headings used in this agreement are for convenience only and do not constitute substantive matter to be considered in construing its terms. The use in this agreement of the terms "include", "includes", "including", and "such as" shall be deemed in all cases to be followed by the words "without limitation". When used in this agreement, "University" includes all segments of the institution including all, athletic and academic departments, as defined in the legal entity "The Trustees of Indiana University."

# § 2    Subject of this SaaS Agreement

2.1    <u>Software</u>

2.1.1    Subject of this SaaS Agreement is the SaaS provision of the Licensed Products by Klopotek to IUP for IUP's own internal business purposes for the term of this Agreement. For the avoidance of doubt, IUP shall not use the SaaS System for the purpose of providing services to third parties.

2.1.2    In addition Third Party Software will be provided to the extent such third party software is necessary for the SaaS.

Such license and IUP's use of the Third Party Software (inclusive of any warranties) shall be subject to the terms, conditions, restrictions and requirements of the product liability conditions and other conditions (including license conditions) of the respective manufacturers of Third Party Software (<u>Appendix 2</u>). In particular, with respect to Microsoft software Klopotek is obliged to pass through the Microsoft Customer License Terms (<u>Appendix 3</u>) and the obligations of Sec. 6 Microsoft Service Provider License Agreement (SPLA) and the further terms and conditions referred to therein. IUP acknowledges and agrees to these terms and conditions.

2.1.3    The current versions of the Third Party Software are listed in <u>Appendix 2</u>. The functionality of the Licensed Products as provided pursuant to this Agreement is specified in <u>Appendix 1.</u>

2.1.4    Documentation of the Licensed Products is provided as an online documentation within the SaaS System. The documentation may contain descriptions of and reference to functionality not within the scope of this Agreement. The functionality of the Licensed Products pursuant to this Agreement is solely as described in <u>Appendix 1.</u>

## 2.2      Hardware and Infrastructure

2.2.1      Klopotek provides the hardware and technical infrastructure necessary for the SaaS provision of the Software and provides the technical operation of such hardware and Software. Hardware and infrastructure are dimensioned to provide adequate performance with regards to the anticipated usage. Klopotek's responsibility for hardware and technical infrastructure ends at the connection point of Klopotek's data center to the public internet. For the avoidance of doubt, remote access to and utilization of the SaaS System (including the IUP client hardware and software) is solely IUP's responsibility and not provided by Klopotek.

2.2.2      The current setup and management of the SaaS System (e.g. regarding Third Party Software, hardware and technical infrastructure) is described for information purposes in Appendix 6. Klopotek may change all aspects of the SaaS System, including hardware, Third Party Software, components, configuration, management and technical infrastructure, in its own discretion, provided that the SaaS Systems shall remain adequate (i.e. sufficiently dimensioned considering the number of users, anticipated use and amount of data processed with the SaaS System) for the SaaS provision of the Licensed Products and that such changes shall not result in a reduction of functionality or performance.

2.2.3      Klopotek provides storage space on its hardware and infrastructure (i.e. database and file system storage space) in accordance with Appendix 6 for the data created by IUP and the data necessary to utilize the SaaS System.

2.2.4      Klopotek ensures regular backups of the database and the file system in accordance with Appendix 6, Sec. 6.6. However, Klopotek is not responsible for the observance of any retention or record-keeping periods that IUP may legally be required to observe. If IUP requires a recovery of data, and the loss of data is not attributable to a default of Klopotek, such recovery shall be charged in accordance with the Klopotek Price List on a time and material basis.

## 2.3      Availability

2.3.1      Klopotek provides and makes the SaaS System available as set out in Appendix 6, Sec. 5, provided that the annual availability shall be 99.5% (instead of 98% as set out in Appendix 6, Sec. 5).

2.3.2   Klopotek may change the availability pursuant to <u>Appendix 6</u>, Sec. 5 by giving three months written notice to IUP if and to the extent Klopotek's suppliers (e.g. Internet provider, hardware provider, Third Party Software provider) change their service levels or technical requirements. If IUP does not agree to the change, IUP shall have the right to terminate this Agreement by giving Klopotek written notice within one month after receipt of the change notice. The termination will take effect three month after Klopotek's receipt of IUP's termination notice. Until the termination becomes effective, <u>Appendix 6</u>, Sec. 5 remains unchanged.

2.3.3   Klopotek will undertake commercially reasonable efforts to maintain the SaaS System outside Working Days and to minimize interference of maintenance with IUP's system usage. If maintenance needs to be performed on Working Days due to technical or organizational reasons, the parties will coordinate such maintenance.

2.3.4   If availability of the SaaS System is less than agreed, Klopotek will refund to IUP for each 0.1% of lower availability 0.05% of the annual SaaS Fee, in full and final settlement and satisfaction of Klopotek's entire liability for any loss, damages, costs or expenses suffered or incurred by IUP.

2.4   <u>Setup and Go Live</u>

2.4.1   The SaaS System shall be configured, tested and implemented in a setup project before go live. The setup project is not subject of this Agreement. IUP will agree a separate setup project with Klopotek or a Klopotek implementation partner.

2.4.2   For the setup project, Klopotek will provide:

- A production environment ("PROD"). This environment shall become the environment which will be used after go live by IUP for productive use.
- A test environment ("TEST"). This environment shall be used by IUP and Klopotek or the Klopotek implementation partner in order to test configurations and train IUP's staff.
- A migration environment ("MIG"). This environment shall be used by IUP and Klopotek or the Klopotek implementation partner for migrating legacy data into the SaaS System.

2.4.3   Provision of a TEST and MIG environment is included in the SaaS Fee until the last day of the month of go live. After go live Klopotek will delete the MIG and TEST environments. After go live, Klopotek will provide a separate TEST environment or other environments only on IUP's request. The setup of such environments requires payment of a one-time setup fee in accordance with the Klopotek Price List. Klopotek will charge IUP with additional monthly SaaS Fees in accordance with the number of users on such environments. For the avoidance of doubt, Sec. 2.3.4 does not apply to the TEST and MIG environment.

2.5    The usage and utilization of the Software and the SaaS System, in particular the creation and pro-
cessing of data using the SaaS System, is IUP's sole responsibility.

# § 3    Ownership and rights of use

3.1    IUP acknowledges and agrees that all right, title and interest whatsoever, in and to the Licensed
Products, the SaaS System and the product documentation, including all intellectual property rights
therein is, and shall be, owned solely and exclusively by Klopotek and/or its licensors. For the
avoidance of doubt, all improvements, innovations, customizations or enhancements to or deriva-
tives of the Licensed Products, the SaaS System and the product documentation, whether invented,
conceived, produced, created or otherwise developed by Klopotek or IUP (or their employees, con-
tractors or agents), whether jointly or severally, shall be owned solely and exclusively by Klopotek.
Nothing in this Agreement shall, or shall be deemed or construed to, assign, transfer or convey to
IUP any title, rights or interest in any intellectual property, including in or to the Licensed Products
and the product documentation, other than the licenses or other rights specifically and expressly
granted herein.

For the avoidance of doubt, IUP remains the sole owner of all intellectual property rights to the data
stored in the SaaS System by IUP.

3.2    Klopotek grants to IUP a non-perpetual, non-exclusive and non-transferable license to use the Li-
censed Products and the product documentation during the term of this Agreement (as set out in
Sec. 4) for IUP's own internal business purposes, subject to the maximum number of users speci-
fied herein and any other limitations, restrictions or requirements specified herein. The license is
non-transferable and non-assignable. The SaaS System and the Licensed Products shall not be
used by or for the benefit of third parties (e.g. by IUP acting as a service provider for third parties) or
sublicensed to third parties.

The licenses granted herein are subject to the following conditions and limitations:

| LANGUAGE | ENGLISH LANGUAGE VERSIONS. |
|---|---|
| **TERM** | **SEE SEC. 4** |
| **NUMBER OF USERS** | **40 USERS** USERS ARE NAMED USERS (INDIVIDUAL PERSONS) DEFINED BY ACCESS NAMES OF THE PERSON OR USER. USERS ARE COUNTED AS REGISTERED IN THE SECURITY DATABASE OF THE KLOPOTEK STANDARD SOFTWARE. THE NUMBER OF USERS IS RELEVANT FOR THE DEGREE OF UTILIZATION. JOINT USAGE OF AN ACCESS NAME THROUGH VARIOUS PERSONS IS NOT PERMITTED. |
| **LICENSE FEE SAAS SYSTEM PER USER AND MONTH** | **SEE APPENDIX 9** |

3.3     If IUP is in default with the payment of more than one invoice or material amounts thereof for a period of more than 30 days, Klopotek shall be entitled, in addition to any other remedies available to Klopotek, to revoke the license and suspend IUP's access to the Klopotek system until IUP has paid all outstanding amounts in full. Such suspension shall require Klopotek giving 30 days prior written notice notifying IUP of the default and requiring it to be cured. For the avoidance of doubt, such revocation and suspension shall not constitute a termination of this Agreement.

# § 4     Term and termination

4.1     The effective date of this Agreement is August 1, 2016  The SaaS Fee shall first become payable on August 1, 2016.

4.2     Klopotek shall provide the SaaS System to IUP on the effective date of this agreement. For the avoidance of doubt, the setup project is not subject to this Agreement. Initial provision is therefore limited to test and/or migration environments until go-live of the production environment (subject to the setup project agreement).

4.3     The initial term of this Agreement shall commence on the 1st day of the month of the effective date and shall continue for a period of 36 months. Thereafter this Agreement shall continue for successive 12 month periods on the same terms, unless terminated by either party by giving three months written notice to the end of a term.

4.4     Either party may terminate this Agreement by written notice to the other party if that other party commits a material breach of its obligations under this Agreement and, where such breach is capable of remedy, fails to remedy such breach within thirty (30) days after receipt of written notice from the party seeking to terminate the Agreement setting out details of the breach and requiring it to be remedied.

4.5     IUP represents that, as of the date of the Agreement, funds sufficient to pay immediate financial ob-
         ligations under the Agreement have been allocated and are available.  However, IUP is a publicly
         funded entity and our ongoing financial obligations herein are subject to allocation of funds by par-
         ties not controlled by the IUP.  In the event, through no action initiated by the IUP, the legislative
         body of the State of Indiana does not appropriate sufficient funds allowing for the continuation of the
         agreement for any fiscal year, whole or part, and there are no funds from other sources to continue,
         the Agreement may be terminated by IUP.

4.6     In the event of any proceedings in bankruptcy or insolvency by or against Klopotek, or in the event
         of the appointment (with or without the preferred participant's consent) of an assignee for the benefit
         of creditors, or of a receiver, IUP may cancel this agreement

4.7     Upon termination IUP may request Klopotek to export and assist with the migration of IUP's data.
         Klopotek shall provide the data export in an open and readable industry standard format (e.g. XML).
         Such export and assistance will be charged in accordance with the Klopotek Price List on a time
         and material basis.

4.8     IUP shall be entitled to require Klopotek to continue to provide the SaaS System for up to 6 months
         after termination of this Agreement upon the then-current terms and conditions of this Agreement
         (including payment terms) if such continuation is required in order to allow for the orderly transfer
         and winding-up of all or part of functionality provided by the SaaS System. This Sec. 4.6 is not ap-
         plicable if Klopotek has terminated the Agreement for material breach by IUP. Continuation shall be
         on an "as is" basis, i.e. Klopotek is not required to install or provide new versions pursuant to Sec.
         8.

# § 5     Fees and Payment

5.1     In consideration of the SaaS provision of the SaaS System a monthly fee will be paid by IUP (the
         "SaaS Fee") in accordance with Appendix 9, starting on or about 8/1/2016 The SaaS Fee is payable
         in advance before the start of each month.

5.2     Consultancy services and any other work or services carried out by Klopotek not included within the
         scope of this Agreement shall be charged in accordance with the Klopotek Price List.

5.3     Klopotek shall have the right to align the SaaS Fee for a new term ("price alignment") by giving three months written notice. For the avoidance of doubt, Klopotek will not increase the price for the period of the initial term (Sec. 4.3). Klopotek hereby agrees that it will not increase the SaaS Fee for a new term by a percentage, which is greater than the published Cost-of-Living Adjustment (COLA) since the last price alignment. However, Klopotek may increase the SaaS Fee by a greater percentage if and to the extent Klopotek's subcontractors (e.g. Internet provider, hardware provider, Third Party Software provider) increase their prices. In case IUP does not agree to the price alignment, IUP shall have the right to terminate this Agreement by giving Klopotek written notice within one month after receipt of the price alignment notice. The termination will take effect three month after Klopotek's receipt of IUP's termination notice.

5.4     The SaaS Fee and any other amounts payable by IUP under this Agreement, exclude all applicable sales, goods and services, value added, use, or other like taxes, levies and charges, chargeable by or payable to any federal, provincial, state, local or municipal taxation authority and IUP shall pay and Klopotek shall remit the same to all applicable taxing authorities as required by law.

5.5     IUP may only retain monies due to Klopotek, or exercise a right of set off in respect of such sums, if they relate to an undisputed claim by IUP or to a claim awarded to IUP by a final and binding court judgment.

5.6     If IUP fails to pay the SaaS Fee or any other amounts payable under this Agreement within thirty (30) calendar days after its due date, such unpaid amount shall bear interest from the date that the amount is payable to the date of payment at the rate of 10% per year, and furthermore, such failure shall be deemed to be a material breach of this Agreement and in addition to any other remedies available to Klopotek, Klopotek shall be entitled to suspend the performance of this Agreement until IUP has paid all outstanding amounts in full.

5.7     Except as expressly provided in this Agreement, each party shall pay its own fees and expenses (including, without limitation, the fees and expenses of its agents, representatives, attorneys and accountants) incurred in connection with the negotiation, drafting, execution, delivery and performance of this Agreement and the transactions it contemplates.

# § 6     Co-operation and obligations of IUP

6.1     IUP shall provide to Klopotek all information which is reasonably required by Klopotek in order to provide the SaaS System.

6.2    IUP shall obtain all required approvals from third parties or authorities for IUP's usage of the SaaS System. This does not comprise approvals regarding the technical operation of the SaaS System.

6.3    The SaaS System can be accessed by IUP via remote access over the internet as specified in Appendix 5. IUP undertakes to follow the specifications of Appendix 5 in relation to remote access. Klopotek may adapt the remote access specifications to further technical developments (e.g. by incorporating new hardware specifications or updating the required hardware and software versions) and IUP shall update its installation at its own expense. Klopotek shall inform IUP in good time before a planned conversion by handing over the amended specifications.

# § 7    Support and Maintenance

7.1    <u>Hotline</u>

7.1.1    Klopotek shall provide a hotline on Working Days. Only the IUP employees named in Appendix 7 shall use the hotline. For the avoidance of doubt, Klopotek may appoint a local partner to provide the hotline and 1st level support.

7.1.2    The hotline to be provided by Klopotek pursuant to Sec. 7.1.1 shall provide IUP with assistance with, but not limited to:

7.1.2.1    problem diagnosis including, but not limited to, analysis of error messages, the identification and isolation of the source of the problem and obtaining information and status of existing problems;

7.1.2.2    resolving defects including, but not limited to, obtaining solutions to Klopotek problems or methods to avoid problems without compromising system performance or by obtaining a workaround to the problem, including but not limited to, installation issues and operating system environment details that relate to Software operation and functionality issues;

7.1.2.3    provision of software bug fixes when a known problem is encountered.

7.1.3    If Faults occur, IUP shall notify Klopotek in writing, describing the symptoms of the Faults where reasonably practicable. IUP commits to notify Klopotek about all Faults that have occurred via Webtrace, which is Klopotek's internet based tracking system. Klopotek shall give IUP on-line access via Webtrace to all Faults and problems reported by IUP, including details of Faults, which are open, the current status of bug fixes and Faults, which have been closed. If Klopotek has closed a Fault in Webtrace and IUP considers that a Fault has not been resolved, IUP can file an objection with Webtrace, creating a follow-up Fault report within a period of 14 Working Days. A Fault shall be deemed to be fixed if IUP does not create a follow-up report within such period.

7.1.4     The use of the hotline for reporting Faults is included in the SaaS Fee.

7.1.5     In case of a fault reported by IUP not being a Fault Klopotek has the right to refer IUP to Klopotek consultants and consulting services for further handling of IUP's report. The hotline's and the consultants' work shall be charged in accordance with the Klopotek Price List.


7.2     <u>Fault rectification</u>

7.2.1     All Faults are classified by mutual consent between the Parties acting reasonably as follows:

| Fault Priority 1 (Fault Prio 1) | First priority Faults exist when functions of the SaaS System can no longer be processed and cannot be by-passed (prevention of operation) where immediate assistance is required by IUP due to the fault having a critical impact on IUP operation and business. |
| Fault Priority 2 (Fault Prio 2) | Second priority Faults exists when the defect can be replaced in an equal manner by other functions of the SaaS System, and when the fault will have a significant impact on IUP operation and business. |
| Fault Priority 3 (Fault Prio 3) | Third priority Faults exist when there are only minor difficulties in using the SaaS System and the fault does not have any substantial effect on the usability of the SaaS System. |

7.2.2     Fault reports by IUP must:

- include sufficient information to enable Klopotek to reproduce the Fault, whenever reasonably possible;

- be in writing using Webtrace (including attachments which document the Fault);

- include the message of the program function and text of any error message, if applicable; and

- describe the effects of the Fault.

7.2.3     IUP shall make available all documents and data reasonably requested by Klopotek and necessary for diagnosing the Fault and shall support Klopotek by providing sufficient qualified operating personnel and any other assistance reasonably necessary for Fault diagnosis and rectification, free of charge.

7.2.4     Klopotek shall use commercially reasonable endeavors to respond to a Fault and to correct Faults as soon as reasonably practicable.  Without prejudice to the generality of the foregoing, Klopotek shall respond to the Fault notification:

- for Fault Priority 1, on the same day as the Fault report, if the latter is received on a Working Day, otherwise immediately afterwards on the next Working Day;



- for Fault Priority 2, no later than the next Working Day following receipt of the Fault report;

- for Faults Priority 3, no later than the next Working Day following receipt of the Fault Report.

   Faults Priority 1 and 2 in the Licensed Products are usually fixed by a patch, Faults Priority 3 in the Licensed Products are usually corrected in the next version of the software.

7.2.5   If the reported Fault produces a condition which no longer permits further operation of the SaaS System in whole or in part, or significantly reduces it, after receipt of the Fault report Klopotek shall without prejudice to its obligations hereunder to correct the Fault immediately state how the Fault can be bypassed, if applicable.

7.2.6   Should it not be possible to rectify the Fault within a reasonable time, Klopotek will advise IUP of the Users that will be affected as a result of the Fault; the actions being taken to resolve the Fault and any assistance that Klopotek requires from IUP to resolve the Fault whereupon the Parties may jointly agree a course of action to develop and carry out a reasonable technical and/or organizational alternative.

7.2.7   Klopotek shall document the Fault rectification on the basis of the Fault situation documented by IUP.

7.2.8   Klopotek is neither able to nor required under this Agreement to correct any faults that may exist in the Third Party Software. Klopotek is however bound, to the extent that it is able, to notify the relevant Third Party Software supplier of any faults in the Third Party Software and to implement any corrections, new versions or new releases of such faulty Third Party Software where such corrections are generally known to Klopotek.

# § 8   Updates and Upgrades

8.1   Klopotek may in its own discretion provide new versions of the Software, in particular if Klopotek or the respective supplier of Third Party Software makes a new version generally available to the public and if such new version is suitable for SaaS.

8.2   However, IUP may not demand the provision of new versions unless the provision of a new version of the Licensed Products is necessary to comply with any changes demanded by the legislature of the countries listed in Sec. 3.2

8.3   For the avoidance of doubt, companies, regulatory bodies or similar enterprises such as Post, Telecom, BIC, BISG, ISO, regardless of their structure, are not defined as the legislature for the purposes of this Clause. Changes in the Licensed Products caused by changes of the terms of contract, tariffs, procedural regulations or the like of these undertakings are not changes in legislature for the purpose of this Clause, even if such changes have to be approved by an ordinance or regulation or by another public authority.

8.4   In the event Klopotek provides an Upgrade of the Licensed Products (i.e. a version with expanded functions, where these expanded functions are usually issued by Klopotek as separate and new products), Klopotek may offer new or expanded functions for a modified SaaS Fee. IUP may decide in its own discretion whether to use such new or expanded functions for the modified SaaS Fee. If IUP declines the offer, the new or expanded functions will not be activated for IUP and the SaaS Fee remains unchanged.

8.5   Klopotek will perform installation of an Upgrade the Licensed Products at no additional costs. However, installation, adaptation or modification of customer-specific customizations or components (e.g. reports, interfaces) that become necessary due to the Upgrade shall be performed by IUP. Upon IUP's request, Klopotek will provide IUP with a written offer for such upgrading of customer-specific customizations or components.

8.6   IUP shall receive the new Product Documentation in electronic form in the event of an update or an upgrade of the Licensed Products at the same time as the provision of the update or the upgrade of the Licensed Products.

8.7   Insofar the provision of a new version of Software results in a reduction of the functionality of the Software, severe detriments regarding IUP's workflow or severe detriments regarding the usability of data created by IUP, and this is known to Klopotek prior to the new version taking effect, Klopotek will notify IUP of such detriments at least one month before provision of the new Software version. In that event shall have the right to terminate this Agreement by giving Klopotek written notice within one month after receipt of the notification.

# § 9   Intellectual Property Rights

9.1   Klopotek warrants to IUP that, to the knowledge of Klopotek, the Licensed Products are free from third-party rights, which could prevent or restrict their use by IUP.

9.2     If, in the event of a claim by a third party alleged after conclusion of the Agreement pursuant to Sec. 9.1 (an "Infringement Claim"), IUP's use of the Licensed Products is impaired or prohibited, Klopotek shall use commercially reasonable efforts, in Klopotek's discretion, to either: (1) procure (at no additional cost to IUP) IUP's right to continue to use the Licensed Products or the infringing part or parts thereof, as the case may be; or (2) replace the Licensed Products or the infringing part or parts thereof, as applicable, with a substitute that provides materially and substantially similar performance and functionality; or (3) modify or replace the Licensed Products (or infringing parts thereof) as the case may be, so that it is non-infringing without materially affecting its performance or functionality.

9.3     Klopotek shall have no liability to IUP or any other person for Infringement Claims to the extent such Infringement Claim has been caused or contributed to by (1) any use by IUP of the Licensed Products in breach of this Agreement, or any use by IUP of any Licensed Products that is not in accordance with the Product Documentation; or (2) any services provided by IUP to other persons; or (3) any use of the Licensed Products by IUP after written notice by Klopotek to IUP to cease using same in connection with an Infringement Claim.

# § 10     Warranties

10.1     Klopotek warrants that:

10.1.1     it has the ability to perform the services and deliver product required by this Agreement; that it will perform said services and deliver said product in a professional, competent and timely manner; that it has the power to enter into and perform this Agreement; and that its performance of this Agreement shall not infringe upon or violate the rights of any third party or violate any federal, state, or local laws or regulations; and

10.1.2     the Licensed Products operate in accordance with the Product Documentation.

10.2    The warranties in this Agreement are the only warranties provided by Klopotek and there are no other warranties, whether written, oral, statutory or implied, including all warranties or conditions of merchantable quality or fitness for a particular purpose, or arising from a course of dealing or usage trade, all of which are expressly denied and disclaimed: except as expressly set forth in this Agreement, IUP accepts and agrees that Klopotek makes no warranties of any kind or nature whatsoever concerning the SaaS System, the SaaS provision of the SaaS System and other services, including (i) that they are error free or free from latent defects, or (ii) the functionality, operation or use of the SaaS System. IUP and Klopotek each confirm that it has not relied on any warranty or promise made by the other party which has not been expressly stated in this Agreement.

# § 11    Liability

11.1    The Parties agree that:

11.1.1    BOTH PARTIES SHALL BE LIABLE FOR WILLFULNESS AND GROSS NEGLIGENCE IN ACCORDANCE WITH STATUTORY PROVISIONS.

11.1.2    THE LIABILITY AND OBLIGATION OF KLOPOTEK, IN THE AGGREGATE FOR ANY AND ALL CLAIMS ARISING OUT OF OR IN ANY CONNECTION WITH THIS AGREEMENT, WITH RESPECT TO ANY COST, EXPENSE, DAMAGE, LOSS, INJURY, OR LIABILITY OF ANY KIND OR NATURE WHATSOEVER, REGARDLESS OF THE FORM OF ACTION OR THEORY OF LIABILITY (INCLUDING FOR BREACH OF CONTRACT, EQUITY, TORT, NEGLIGENCE, BY STATUTE OR OTHERWISE) SHALL BE LIMITED TO DIRECT DAMAGES AND SHALL NOT EXCEED **FIFTY THOUSAND DOLLARS ($ 50,000)**.

11.1.3    IN NO EVENT SHALL KLOPOTEK BE LIABLE TO IUP OR TO ANY THIRD PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR NATURE WHATSOEVER (INCLUDING FOR LOSS OF DATA, LOSS OF REVENUE OR PROFITS OR FOR BUSINESS INTERRUPTION) SUFFERED BY IUP OR OTHER THIRD PARTY HOWSOEVER CAUSED AND REGARDLESS OF THE FORM OF ACTION OR THEORY OF LIABILITY (INCLUDING FOR BREACH OF CONTRACT, TORT, NEGLIGENCE, BY STATUTE OR OTHERWISE), EVEN IF SUCH DAMAGES ARE FORESEEABLE OR KLOPOTEK HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

11.2    Klopotek shall observe the minimum insurance as listed in Appendix 10.

11.3    Klopotek shall indemnify and save harmless IUP, its officers, agents and employees from any and all losses, costs, damages, liability and expenses (including costs of defense, settlement, and reasonable attorney's fees) in connection with claims or suits of third parties for damage to property and/or injury to persons, including death, alleged or claimed to have been caused, by or through the performance of the work or operations incidental to the work, by Klopotek, its agents or employees, or by its subcontractors of any tier, their agents or employees, whether through negligence or willful act; and Klopotek shall at request of IUP undertake to investigate and defend any and all such claims or suits against IUP

11.4     If, because of riots, war, public emergency or calamity, fire, flood, earthquake, act of God, government restriction, business operations at IUP are interrupted or stopped, the performance of the Agreement, with the exception of money already due and owing, shall be suspended and excused to the extent commensurate with such interfering occurrence.  The expiration date of the Agreement may be extended, by mutual written consent, for a period of time equal to the time that such default in performance is excused. Neither party shall be in considered in breach of the agreement for failure to perform if such failure is caused by national or local calamity, acts of terrorism, the act or regulation of any public authority, labor difficulty or strike, war, epidemic, fire, storm, inclement weather or other act of God, or any other cause beyond the reasonable control of the non-performing party that renders that party's performance impossible.

# § 12   Confidentiality

12.1    In this Agreement "Confidential Information" means all information and documents disclosed by a party (the "Disclosing Party") to the other party (the "Receiving Party"), including, without limitation, software, know-how, formulas, processes, ideas, inventions (whether patentable or not), schematics and other technical, business and financial information. Confidential Information includes not only written information but also information transferred orally, visually, electronically or by any other means.

12.2    Confidential Information shall not include information
- which was known to the Receiving Party prior to disclosure by the Disclosing Party; or
- which is lawfully made available to the Receiving Party by a non-party free to make such disclosure without breach of any legal obligation; or
- which the Receiving Party develops independently without use of any Confidential Information; or
- which is, or becomes, publicly available without breach of any duty of confidentiality.

12.3    Each party shall at all times during the performance of this Agreement use the Confidential Infor-
        mation of the other party solely and exclusively as may be reasonably necessary for the perfor-
        mance of its duties or the exercise of its rights pursuant to this Agreement, and for no other purpose
        without the other party's prior written consent. Confidential Information shall be kept secret and con-
        fidential and shall not be disclosed to anyone except, on a need-to-know basis, to a limited group of
        its own directors and employees (in case of Klopotek including, directors and employees of affiliated
        companies) and outside professional advisors. Each person to whom such Confidential Information
        is disclosed must be advised of its confidential nature and of the terms of this Agreement and (un-
        less already bound by obligations of confidentiality) must agree in writing to abide by such terms.

12.4    The Receiving Party may disclose Confidential Information where disclosure has to be made as a
        result of subpoena, requirement or official request from any competent judicial, administrative, legis-
        lative or regulatory authority or body. In this case the Receiving Party shall provide the Disclosing
        Party with prompt notice so that the Disclosing Party may seek a protective order or other appropri-
        ate remedy and/or waive compliance with the provisions of this Agreement.

12.5    Upon the completion of or any termination or expiration of this Agreement, or upon the written re-
        quest of a Disclosing Party at any time, a Receiving Party shall return all hard copy documents
        which contain Confidential Information to the Disclosing Party, shall destroy all electronic docu-
        ments or files which contain Confidential Information and shall immediately cease all use of the
        Confidential Information.

12.6     Unless specifically authorized in writing by the University Purchasing Department on a case by
        case basis, Klopotek shall have no right to use, and shall not use, the name of Indiana University,
        its officials or employees, or the seal or marks of the University in advertising, publicity, or promo-
        tion; nor to express or imply any endorsement of Klopotek's supplies or services.

12.7    Klopotek acknowledges that University is subject to the Indiana Access to Public Records Act
        (APRA), I.C. 5-14-3-et seq., and that this Agreement, and some or all of the documents provided
        pursuant to this Agreement, may be required to be disclosed pursuant to that law.  Klopotek  further
        acknowledges that certain categories of records or documents may not have to be produced pursu-
        ant to APRA.  Klopotek agrees to use its best efforts to mark records and documents provided to
        IUP that it believes, in good faith, are not required to be produced pursuant to APRA, as "Confiden-
        tial". (For example, trade secrets as defined by the Indiana Code.)  IUP agrees that, upon receipt of
        a request made pursuant to APRA for documents that have been marked "Confidential", or that is
        deemed to be Confidential Information under this Section 12, it shall a) promptly notify Klopotek of
        the fact and content of the request, b) consult with Klopotek regarding whether or not the University
        is required to produce the documents, and c) disclose the records that IUP, in the opinion of its legal
        counsel, is legally compelled to disclose.

In the event that IUP is made party to any proceeding or litigation arising out of the assertion of an exemption to APRA, Klopotek shall indemnify University for all costs, attorney fees, awards, fines, damages or other monetary amount of any kind.  Klopotek shall cooperate with IUP in defending any such proceeding or litigation.

12.8    The provisions of this Sec. 12 shall survive the termination or expiration of this Agreement or part thereof.

## § 13     Additional services

13.1    Klopotek provides upon request the account management services described in <u>Appendix 6</u>, Sec. 6.10. These services may be ordered using Webtrace and are included in the SaaS Fee.

13.2    IUP may order additional services not covered by the SaaS fee on request. Such services shall be charged in accordance with the Klopotek Price List.

13.3    Upon termination of this Agreement IUP may require a handover of IUP's data stored in the SaaS System. Such handover will be charged in accordance with the Klopotek Price List

## § 14     Final provisions

14.1    This Agreement is the entire agreement between the parties with respect to its subject matter, and there are no other representations, understandings or agreements between the Parties relative to such subject matter. This Agreement shall enure to the benefit of and be binding upon all of the par-ties and their respective legal representatives, successors and permitted assigns. This Agreement may not be assigned by either party without the prior written consent of the other party. No addi-tional term or condition included in any IUP purchase order or other document issued by IUP that has not previously been agreed to in writing by Klopotek shall bind Klopotek. It is mutually under-stood and agreed that an independent contractor relationship is hereby established and that em-ployees of Klopotek are not employees of IUP and that employees of IUP are not employees of the Klopotek.

14.2     Klopotek  shall comply with the following University policies found at: http://policies.iu.edu/poli-cies/categories/administration-operations/index.shtml.   In connection with the performance of work under this Agreement, Klopotek agrees not to discriminate against any student, employee or appli-cant for employment because of age, race, religion, color, handicap, sex, sexual orientation, or na-tional origin.  Klopotek  further agrees to take affirmative action to insure equal employment oppor-tunities.  Klopotek, including all employees and agents, shall agree to abide by, and comply with, all IUP, federal, state, and local policies, regulations, and laws that pertain to sexual harassment and non-discrimination. Klopotek further agrees that employees and agents, while on IUP's premises, shall comply with and observe all applicable rules and regulations concerning conduct on the IUP's premises, which are imposed upon the IUP's employees and agents

14.3     Klopotek shall have the right, without the consent of IUP, to subcontract the performance of all, or any part of, the performance of its obligations under this Agreement. Any subcontracting by Klopotek shall be on the condition that Klopotek shall remain fully responsible and liable to IUP for any acts or breach of this Agreement by its subcontractors and any such breach shall be deemed to be a breach by Klopotek hereunder.

14.4     No amendment to, or change, waiver or discharge of, any provision of this Agreement shall be valid unless in writing and signed by authorized representatives of each party.

14.5      If any provision of the Agreement or its application to any party or circumstances shall be invalid or unenforceable to any extent, the remainder of the Agreement and the application of its provisions to other parties or circumstances shall not be affected and shall be enforced to the extent permitted by law.

14.6     No delay or omission by any party to exercise any right or power it has under this Agreement or to object to the failure of any covenant of any other party to be performed in a timely and complete manner, shall impair any such right or power or be construed as a waiver of any succeeding breach or any other covenant. All waivers must be in writing and signed by the party waiving its rights.

14.7      The Agreement shall be governed by the laws of the State of Indiana, and Klopotek shall at all times comply with and observe all federal, state and local laws, ordinances, and regulations which are in effect during the period of the Agreement and which in any manner affect the work or its con-duct.

14.8   With the exception of notice of termination, which must be made by certified mail, any written notice called for in the Agreement may be given by personal delivery, first class mail, overnight delivery service or facsimile transmission.  Notices given by personal delivery will be effective on delivery; by overnight service, on the next business day; by first class mail, five business days after mailing; and by facsimile, when an answer back is received.  Notices shall be sent to:

| Indiana University | Klopotek |
|---|---|
| | |
| Tally Thrasher, C.P.M. | David Hetherington, EVP & COO |
| Indiana University Purchasing Department | Klopotek North America, Inc. |
| 1000 Waterway Blvd, Ste. 101 | 2001 Route 46 |
| Indianapolis, IN  46202 | Parsippany, New Jersey 07054 |
| tthrashe@iu.edu | D.Hetherington@klopotek.com |
| Phone:      317.274.7404 | Phone: 908.458.5928 |
| Fax:      812.855.7839 | Fax: 973.710.9186 |

14.9   This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one single agreement between the parties.  This Agreement may be executed by facsimile signatures.

14.10  Each of the parties agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each party shall execute and deliver any further legal instruments and perform any acts which are or may become necessary to effectuate the purposes of this Agreement.

Contract Number: SaaS-109260-2016-01-01

Page 21 of 21

IN WITNESS WHEREOF the parties have duly executed and delivered this Agreement as of the date first written above.

**Indiana University**

Telly Thresher C.P.M.

_Director of Purchasing Admin_
Name, Title and Signature

July 13, 2016

**Klopotek North America, Inc.**

David M. Platts
CUO
Name, Title and Signature

July 13, 2016

GEORGE LOGAN
VP SALES & MARKETING
7/12/16

DMH

# EXHIBIT 2

klopotek.

# A P P E N D I X   0 9

# P R I C I N G   S a a S   A g r e e m e n t

VERSION:     01 – 28 DECEMBER 2011

         02 – 01 JANUARY 2013

         02 – XX MONTH 2014 APPLY STANDARD FOR INDIANA
               UNIVERSITY PRESS

klopotek.

# 1   SaaS Fee

In consideration of the SaaS provision of the SaaS System a monthly fee will be paid by Indiana University Press in accordance with the Agreement and the then-current Klopotek Price List.

The monthly SaaS Fee is as follows:

| Monthly SaaS Fee | | | |
|---|---|---|---|
| **Workstations** | | **Amount per Workstation** | **Amount per Month** |
| **40** | Workstations full use | $          150.00 | $        6,000.00 |
| | **Total Monthly SaaS fee** | $          150.00 | $        6,000.00 |

The payment schedule for the monthly SaaS Fee is as follows:

| Payment Schedule | | |
|---|---|---|
| **Installments** | | **Amount per Month** |
| **60** | SaaS Fee | $        6,000.00 |
| | | |
| **60** | **Monthly Installments** | **360,000.00** |

1.  Payment schedule – Project Fees
    a.  40% on Contract Signature
    b.  30% at Project Mid-Point
    c.  30% at Project Acceptance

2.  Workstation fees commence with the release of the SaaS environment at the Klopotek Service Center

3.  Workstation fees are due one month in advance with payment terms of net 30. Payment by wire transfer required. Please send wire transfers to the following account:

    JPMorgan Chase Bank, N.A.
    821 United Nations Plaza
    New York, NY 10017

    Routing: # 021000021
    Account Number: # 015-6228777-65
    Swift Code: CHASUS33

# EXHIBIT  3



# Indiana University
## PURCHASE ORDER

PO Number: **1903099**

Contract Manager: Tally Thrasher

| Vendor | Shipping Address |
|---|---|
| Klopotek North America, Inc.<br>ATTN: null<br>2001 Route 46<br>Suite 203<br>Parsippany, NJ 07054 | Harding, Melissa<br>WELLS LIBRARY Room #350<br>1320 E 10th St<br>Bloomington, IN 47405-3907<br>812-855-1626 |

| Shipping Terms | Payment Terms |
|---|---|
| | Net 30 Days From Receipt of Invoice |

| Delivery Required By | | |
|---|---|---|
| **Order Date**<br>11-01-2016 | **Customer #** | **Billing Address**<br>Indiana University<br>IU Accounts Payable<br>400 E 7th Street, Room 021<br>Bloomington, IN 47405-3003 |
| **Delivery Instructions** | **Contract ID** | |

Invoice status inquiry: https://fdrs.fms.indiana.edu/cgi-bin/AP/AP/invoice.html

**Vendor Note(s)**
***Check Enclosed*** initial prepayment of 40% of total project: $60,000.00 to be sent with attached amendments

Vendor Stipulations and Information

| Item No. | Quantity | UOM | Description | Unit Cost | Extended Cost |
|---|---|---|---|---|---|
| 1 | | | Order to Cash Module total project payment per amendment attached | 150000.0000 | $150,000.00 |
| | | | | | |
| | | | Total order amount: | | $150,000.00 |
| | | | | | |

1 The delivery of all goods and services must comply with all state and federal laws and Indiana University's policies: http://www.indiana.edu/~purchase/vendor/vendor.php. Further, in the delivery of goods or services that might involve sensitive data, the supplier shall adhere to the practices outlined here: http://datamgmt.iu.edu/policies.shtml.

2 Pursuant to 2 CFR Part 180, Indiana University shall not knowingly conduct business with person(s) or entities on the federal Excluded Parties List Service:  http://www.epls.gov/ ("EPLS").  Acceptance of the conditions of this purchase order by performance or delivery constitutes certification by the Vendor that Vendor (or any of its principals or sub-contractors) does not appear on this list and has not been debarred, suspended, proposed for debarment or suspension, or otherwise declared ineligible to participate in or receive federal contracts or subcontracts (collectively, "excluded").  Vendor shall notify Indiana University immediately if it becomes excluded and/or listed on the EPLS.  Indiana University shall be entitled upon such notification to cancel this purchase order and to withhold payment for any goods and services that have not been provided prior to notification.  In the event of a breach of this certification, Indiana University shall be entitled to refuse payment for goods or services and to recover all payments made to Vendor when Vendor was excluded and/or listed on the EPLS.

3 Address packages exactly as instructed above. Place Purchase Order Number on all package labels.

4 All deliveries are to be made to the address and room number as listed above.

5 Invoices must be sent showing purchase order number to: Indiana University, IU Accounts Payable, 400 E 7th Street, Room 021, Bloomington, IN 47405-3003 or email the invoice to invoice@indiana.edu.

6 Indiana University is free of all Excise and Indiana Sales Taxes.Certificate #00-31232940008 will be furnished upon request.

7 Indiana University policy prohibits discriminatory practices in regard to age, color, disability, gender, gender identity, marital status, national origin, race, religion, sexual orientation, or veteran status.

Tim W. Rice
Executive Director of Procurement Services

Tally Thrasher   317-274-7404

klopotek.

# AMENDMENT TO THE PROJECT AGREEMENT

## CONTRACT NUMBER PAA-109260-2016

| | |
|---|---|
| **CONTRACT** | 01 |
| **VERSION** | 01 |

BETWEEN:    Klopotek North America, Inc.
2001 Route 46
Parsippany, New Jersey 07054

hereinafter referred to as Klopotek

AND:    Indiana University
1000 Waterway Blvd., Ste. 101
Indianapolis, Indiana  46202

hereinafter referred to as "IU"

IU and Klopotek are parties to a SaaS Agreement No. SAAS-109260-2016-01-01 dated July 12, 2016 ("SaaS Agreement") and a SaaS Setup Project Agreement No. PA-109260-2016-01-01 dated July 12, 2016 ("Project Agreement"), both as amended by a sideletter dated July 12, 2016.

In order to implement an "Order to Cash" functionality ("O2C") based on Klopotek's standard Order to Cash software as an addition to the SaaS System provided to IU under the Project Agreement and SaaS Agreement, the parties hereby agree to amend the Project Agreement as follows:

1.  <u>O2C Setup Project Services</u>

1.1. The Setup Project services pursuant to the Project Agreement will be amended by the following professional services for the implementation of O2C:

   (1)  Project Management
   (2)  Basic System Activities including
       a.   Kick-Off and project introduction
       b.   Basic system settings
       c.   Batch Chain set-up
       d.   Access & User Security group security definition & Set-up
       e.   Product Pool Training ( books & journals)
       f.    Batch Monitor Training
       g.   Training – Report Handling
   (3)  Book Sales & Distribution
       a.   Distribution Product Pool
       b.   Set & Series Distribution
       c.   Address Pool Customers
       d.   Orders & Invoices
       e.   Standing Orders
       f.    POD Purchase Orders
       g.   Warehouse Management
   (4)  Journal Sales & Distribution
       a.   Publication Pool
       b.   Subscription bundles & supplemental offers
       c.   Address Pool prospects
       d.   Address pool customers
       e.   Address & Customer Maintenance
       f.    Order Entry – including bundles
       g.   Document generation – invoices & quotes
       h.   Tax

     i.   Renewal Definition

     j.   Renewal Generation (notices, quotes, orders)

     k.   Issue Processing

     l.   Documents - invoices, labels, files, etc.

     m.  Product Export

(5) Interfaces Evaluation

(6) Migration Evaluation

1.2. The O2C implementation is based on Klopotek's Order to Cash standard product and the attached memorandum / discovery document (<u>Appendix 1</u>), which was prepared by Klopotek consultants and subsequently submitted to, reviewed by and confirmed by IU.

1.3. The O2C Setup Project does not include building of interfaces. All O2C related data migration will be accomplished via Excel spreadsheets or keyed in by IU.

1.4. After acceptance of the overall Setup Project and Go Live, the O2C functionality will be provided to IU as part of the Licensed Products and the SaaS System pursuant to the SaaS Agreement. The O2C operations at IU will require 3-10 users. These users are already included in the 40 contracted users under the SaaS Agreement. No additional users are currently required.

1.5. After Go-Live, IU may require a monthly batch chain to support book and journal billing and order operations. Such batch chain operation requires an additional fee as an addition to the SaaS Fee and is not included in this Amendment.

2.   <u>Pricing</u>

2.1. For the O2C Setup Project, IU shall pay an additional Project Fee of $150,000 ("O2C Project Fee"). The O2C Project Fee shall be due and payable in correspondence with the agreed payment schedule:   .

-   40% upon signature of this Addendum

-   30% at Project Mid-Point, payable net 30 days after receipt of invoice by Klopotek

-   30% at Project Acceptance, payable net 30 days after receipt of invoice by Klopotek

Klopotek reserves the right to modify the O2C Project Fee in the event of a significant variance in effort from the assumptions outlined in <u>Appendix 1</u>.

2.2. Travel and accommodation costs and additional expenditure for meals are not included in the O2C Project Fee and shall be fully reimbursed by IU. Approximately 16-20 days will be required for on-site work at IU or possible visits of IU's commercial partners. Reasonable out-of-

pocket expenses for travel, lodging, and meals will be billed by Klopotek and IU shall pay such costs and expenses. Expenses are billed at actual costs incurred. Klopotek will undertake travelling only after clearance with IU.

3. Since the O2C Setup Project is an amendment and extension of the overall Setup Project, the terms and conditions of the Project Agreement apply. Except as expressly stated in this Amendment the terms and conditions of the SaaS Agreement and the Project Agreement remain the same and in full force and effect.

**Appendices**

Appendix 1 -    IUP O2C notes / discovery

**Indiana University**                                   **Klopotek North America, Inc.**

*Tally Thrasher, C.P.M.*

Tally Thrasher. C.P.M.                         ...

Director of Purchasing Admin.

Nov. 1, 2016

Project: IUP O2C

Subject: **O2C Notes**

**Klopotek North America, Inc.** | Date: Sept 15, 2016



**klopotek.**

M E M O R A N D U M



Following is a summary of Indiana O2C considerations as compiled from Steve Waldron interview notes on August 10, 2016 and subsequent conversation between Dave Hulsey, Mike Noth, and David Hetherington on 9/12/16.

The information contain in this document will be used as the foundation for Klopotek's order to cash proposal to Indiana University Press.

1. I met with the current two users of the existing CATS O2C system. There are only three users who handle the A/R and order entry today. Order entry is all manual but files are compiled in Excel and sent to/received from:

   a. Ingram Publishing Services, Sheridan and CAP (Combined Academic Publishers) in the UK. They get files from their website every day which has the online orders which they key into CATS and then they get incorporated in the files for distribution. As noted on line 20, web sales will not apply once Klopotek is operational. Web site sales expected to be handled by IPS by December 1, 2016.

   b. The CATS system is still MSDOS and does not support subscriptions so it's currently necessary to treat subscriptions as book orders, there is an ISBN per Journal / Issue and orders are forced to backorder so that issues can be released when required on a quarterly, bi-annual or tri-annual release.

2. Labels are created by IPS, CAP, Sheridan, LSI, and DPDM from the Excel file that they receive from IUP.

3. There are approximately 3500 book products that are all available in three versions. Hardback, Paperback and eBook. (so 10,500) Audio DVD CD SLICE

4. EBooks are only available in MULTIPLE formats which is .epub / epdf/ Mobi.

5. There is a process available to sell articles (JSTOR only) and also chapters (slices) for Books only. And they are not set up in the system. These are not involved in current subscriptions business. (Selling by chapters / articles is something IUP would like to have available for the future).

6. There are 60 Journal products (including distributed papers) that are all Issue based with issue releases quarterly, bi-annually or tri-annually.

7. All journals are available in physical form or digital form. One journal, GLS, is digital only.

8. Subscribers can join the journal at anytime, however, they will be processed into the standard renewal sequence. IUP will also accept cancellations and stop shipping but do not offer a credit on cancellations.

9. Products are not bundled today but this would be future requirement.

10. There are no special business / sales models such as DDA in operation at this time.

11. Renewals are done out of CATS in physical mail form. No email, though this would be a cost benefit for the future.

12. EBSCO is the primary support for the library market

Project: IUP O2C                                    M E M O R A N D U M

Subject: Notes

**Klopotek North America, Inc.** | Date: September 15, 2016

13. There is one membership related journal (currently, but number may grow) with membership pricing tiers and the need to tack members etc.

14. Credit card processing is supported using PayPal.

15. There are no sales teams or commissions that need to be supported.

16. Physical inventory reports come from IPS, Sheridan and CAP monthly which are used in CATS to forecast product stock requirements when planning fulfillment of the Journals release etc.

17. All shipping or freight costs are rolled into the product price and not calculated separately. This applies only to journals.

18. Regular product and customer feeds are made to the distributors in file form.  Currently use ONYX 2.0 for metadata feeds.

19. Journal issue releases are manually organized and are not on a regular release schedule. They are also mainly related to the academic seasons. **Renewals are based on the academic season. The release of issues is not based on the academic season.

20. IUP has just signed an agreement with Aer.io to handle all web sale processing. The sales will be included in the daily report from IPS.

21. The O2C operations at IUP will require 3 -10 seats but these seats are already included in the 40 contracted seats under the existing SaaS agreement. No incremental seats are required at this time.

22. No additional interfaces have been identified as of 9/12. The presumption is that orders to distributors will continue to be provided by Excel files as is currently done from CATS.

23. Any additional data migration will be from existing business systems already covered by the current contract. That said, these represent additional migrations and neither the cost of these incremental migrations, their scale, or the quality of the data has been evaluated as yet. Data to be migrated includes sales records (including sales by title and sales by account), unit costs,  and subscription management records

24. Required delivery date is the same as go-live date for the core project.

25. Indiana collects sales tax for Indiana and Canadian sales.

26. Additional information must be collected regarding the ecommerce website – the impact of this has not been considered in this document and will not be considered in Klopotek's O2C estimate based on the information presently available.

# EXHIBIT 4

October 3, 2019

Klopotek North America, Inc.
**Attn: George Logan, VP of Sales and Marketing**
959 Route 46 East, Suite 502
Parsippany, New Jersey 07054

**Re: IU Press Klopotek Agreement**

Dear Mr. Logan,

On January 17, 2019, Indiana University's Executive Director, Purchasing Services, Tally Thrasher, received an email and attached report from you titled Response to Document IUP-KLOPOTEK Report ("Klopotek's Response"). After considering Klopotek's Response, along with Klopotek's prior responses and performance, Indiana University ("IU") hereby terminates the Klopotek SAAS Agreement (the "Agreement") effective November 8, 2019 and demands Klopotek reimburse IU for all fees paid under the Agreement, including all monthly fees paid by IU as of the date of this letter.

More than three years ago, the Indiana University Press ("IUP") entered into the Agreement with Klopotek to implement Klopotek's business intelligence system (the "System") in hopes of replacing IUP's outdated systems. While IUP was impressed with the initial promises Klopotek made, Klopotek repeatedly missed deadlines and provided a System that continues to have extensive functionality issues. Now, more than two years after the System was scheduled to be up and running, IUP still does not have a fully functional System as agreed upon, nor a reasonable timeline for when such functionality will be achieved. In fact, IUP continues to use its outdated title management and business systems as a result of the deficiencies in the System and Klopotek's performance.

In December of 2018, Tally Thrasher emailed you, informing Klopotek that IU: (1) considered Klopotek in breach of contract, (2) desired to pursue an exit strategy to terminate IU's Agreement with Klopotek, and (3) expected a full refund of more than $600,000 paid for implementation of the System, in addition to all monthly fees paid by IU. On December 19, 2018, you replied to Ms. Thrasher explaining that Klopotek did not believe such a refund was merited. The parties have exchanged additional correspondence since, but IU's position remains the same—Klopotek failed to deliver IU a System that conforms to the standards and functionality represented in the Agreement and discussions with IU, which, for the reasons discussed below, constitutes breach of contract and misrepresentation for which IU demands complete reimbursement.

## I.      **Klopotek's Breach of Contract**

IU and Klopotek entered into the Agreement on July 12, 2016.  In Section 10.1.1 of the Agreement, Klopotek warrants that "it has the ability to perform the services and deliver product required by this Agreement; [and] that it will perform said services and deliver said product in a professional, competent, and timely manner." After the Agreement was signed, the parties began the onboarding stage, which included data migration, training, and testing of the System. At this time, the parties agreed that the System would go live on July 1, 2017.

Klopotek asserts that the System did go live in July 2017, as evidenced by a Milestone Acceptance Certificate signed by the parties.[1] In that Certificate, IU accepted the milestones, but the parties agreed that fifteen faults remained in the System's functionality. Aside from two of these limitations, Klopotek agreed to resolve each of these issues by August 11, 2017. Not only did Klopotek fail to meet many of these new deadlines, but as of January 31, 2018, forty-two tickets for faults in the System remained open.[2] Considering these deficiencies remained at least a year and a half after the Agreement was signed, Klopotek did not truly deliver the System as warranted. Regardless of whether the System "went live" at some level by the July 2017 timeline, Klopotek clearly failed to meet its warranty regarding the *timely* provision of a functional System.

Klopotek's Response frequently relies on the fact that some faults were never reported by IU via the issue-tracking tool, explaining, "We can't respond to issues that are never reported in Elementool."[3] Although IU may not have submitted every fault into the tracking system, at least sixty-nine tickets for faults were submitted to Klopotek[4], forty-two of which remained unresolved as of January 31, 2018. This delay is a breach of Klopotek's Support and Maintenance duties provided in Section 7.2.4 of the Agreement, which states, "Klopotek shall use commercially reasonable endeavors to respond to a Fault and to correct Faults as soon as reasonably practicable."

Eventually, Klopotek set a new deadline to address the remaining faults at the January 2018 Steering Committee Meeting, asserting that "Based on current identified project activities, all tasks will

---

[1] Section 4 of the SAAS Setup Project Agreement references a Milestone Acceptance Certificate, but Section 4 does not explain the effect such Certificate may have on the Agreement, specifically the parties' respective obligations thereunder. The Agreement itself does not mention Milestone Acceptance Certificates. As such, IU refutes Klopotek's suggestions that the product was delivered in a professional and timely manner (as warranted in Section 10.1.1 of the Agreement), especially considering numerous deficiencies with the System's functionality remain unresolved to this day.

[2] This number was derived from slide #6 of the power point presentation Klopotek provided at the Steering Committee Meeting on January 31, 2018.

[3] Klopotek's complaints regarding IU's reporting of issues is troublesome for multiple reasons: (1) IU was contractually obligated to report all faults via Webtrace per Section 7.1.3 of the Agreement, (2) at the Steering Committee Meeting on January 31, 2018, Klopotek provided in the meeting notes on slide #2 of the power point presentation that "IUP will no longer enter WT tickets. All issues will be logged in Elementool." and (3) to IU's knowledge, IU never signed off on such change in fault reporting, which is required per Section 14.1 of the Agreement in order for such responsibility to fall within the Agreement.

[4] The fact that not all faults were reported, coupled with the existence of sixty-nine reported faults, further demonstrates the vast array of nonconformities IU has experienced with the product Klopotek delivered.

be complete by March 15."[5]  Klopotek's corresponding meeting notes echoed this assertion, providing that "KNA has an [sic] realistic action plan to complete all known open tasks already logged in Element Tool by March 15."[6]  Nonetheless, the March 15, 2018 deadline came and went, and Klopotek was forced to set a new deadline of October 31, 2018, which, at the time, appeared next to the majority of the open tasks to be completed that were listed in the Elementool report.  However, as the new October 2018 deadline approached, IUP learned that Klopotek needed to pushback its own deadline again, this time, to the end of the 2018 calendar year.

As of today, Klopotek has yet to provide IUP with communications regarding when the System and its remaining faults will be corrected, nor has Klopotek assigned additional staff or resources to address such remaining issues. This is true even after Indiana University's Executive Director, Purchasing Services, Tally Thrasher, formally informed Klopotek of IUP's concerns on two occasions. Klopotek's repeated failure to meet its own, pushed back deadlines evidences its breach of Section 7.2.4 to use commercially reasonable endeavors to respond to and correct faults *as soon as reasonably practicable*.

In addition to Klopotek's failure to correct reported faults in the System's functionality in a timely and commercially reasonable manner, Klopotek breached its warranty to provide a System that operates "in accordance with the Product Documentation" as required by Section 10.1.2 of the Agreement. Klopotek's Product Documentation and functionality charts provide descriptions of the System's functional components, many of which do not perform at all or in accordance with such descriptions even though Appendix 1 (Setup Implementation Scope) evidences they were in scope. In fact, out of the eighteen functional components that were agreed to be in scope, most of those components currently remain non-functioning or wholly impractical to use.

For instance, the Catalog and Flyer Creation (Module B2 – PAM Ref C3) functionality described in the Title Management and Product Marketing BPS Functionality Chart states that "the marketing material fed from the various entries of the product is published either to a website or to a printing supplier. Created flyers can be sent via e-mail." Although this functionality was promised during the original demonstration and setup process leading up to the parties' execution of the Agreement, Klopotek later admitted to IUP that their System does not generate the flyers, and that this functionality can only be provided by a third party. Further, one of the most substantial functionality issues relates to the System's inability to track actual book costs and expenses, especially when a book has multiple editions. The warranted Calculation feature (Module C3 – PAM Ref G2, G3, and G4) described throughout the Editorial BPS Functionality Chart remains unusable after over a year of promises and delays.[7] In fact, IUP continues to rely on its outdated title management system for its profit and loss calculations. Such profit and loss functionality is a fundamental component of a business intelligence system for a publishing organization, and the fact that the System does not provide this key functionality as warranted is unacceptable. Ultimately, had IUP known that Klopotek's System would not provide this functionality, IUP would not have selected Klopotek or executed the Agreement.

---

[5] This assertion was copied from power point slide #3 of Klopotek's presentation at the January 31, 2018 Steering Committee Meeting.

[6] Quote was taken from Klopotek's meeting notes accompanying power point slide #3.

[7] As of today, the preliminary cost estimator does not calculate correctly, and the relevant data is not available to calculate gross profit or to do analysis.

The System's original Rights Management component (Module D – PAM Ref I4, I6, K2, K3, K4 within the Contract Rights and Royalties PPM) also suffers from significant functionality and usability issues. Klopotek eventually advised IUP not to use Klopotek's PPM module, instead suggesting that IUP utilize Klopotek's new, web-based Rights Sales Manager STREAM ("RSM"), which Klopotek insisted was the preferred replacement for other publishers. To this day, the System's RSM component contains fundamental flaws even with the most basic functionality including, the user's ability to filter and sort search results, to utilize the Contract/Title Libraries, and to use the "create a new rights interest" feature. IUP expressed its concerns towards the System's deficient RSM component on multiple occasions, yet Klopotek continuously failed to provide the necessary interfacing between the original PPM module and the new RSM. Klopotek's Response acknowledges its own failings, noting that "Klopotek is actively working on the PPM to RSM product interface…[and]…Klopotek agrees that the product interface is taking far longer than anticipated." As of today, Klopotek has provided no evidence or explanation as to when these issues will be resolved.

Unfortunately, there are many other non-functional and impractical components present within the current System. Regardless, the issues and delays described above evidence Klopotek's breach of its warranties described in Sections 10.1.1 and 10.1.2 regarding the provision of a functional system in a timely manner.  Further, the fact that a significant number of these issues remain unresolved three years after the parties entered into the Agreement (even though IUP reported at least sixty-nine total faults to Klopotek over this time) demonstrates Klopotek's failure to meet its duties under Section 7.2.4, specifically, "to correct Faults as soon as reasonably practicable."

## II.      Klopotek's Misrepresentation

Before entering into the Agreement with Klopotek, IUP was using two outdated systems—a title management system and a business system. As IUP's product portfolio continued to grow and diversify, it became clear to IUP that its outdated systems could not provide IUP with the detailed monitoring and assessment of sales performance and forecasting, nor manage the coordination of product workflows among all departments of IUP, including acquisitions, operations, marketing, and business. As a result, it became critical to upgrade IUP's title management system and business system to a single, integrated system capable of superior tracking and analytical capabilities, which IUP explained in its subsequent RFP. Upon learning of IUP's RFP, Klopotek submitted a proposal in February 2016 making a number of representations and assertions regarding its System's capabilities.

Unfortunately, throughout IUP's relationship with Klopotek, including Klopotek's initial proposal, sales presentation and demonstration, System setup, and numerous meetings and conversations between the parties; Klopotek misrepresented that it could provide a single robust business intelligence system capable of addressing IUP's business needs. Klopotek had numerous opportunities, throughout the onboarding and setup stages, to disclose any foreseeable issues or delays relating to IUP's transition to the new System. Rather than discussing potential delays in IU's ability to utilize the System or shortcomings in the System itself, Klopotek continued to promise and represent to IUP that Klopotek would deliver a fully functional system within a reasonable time and that the System would conform to best publishing practices necessary for fulfilling IUP's needs. IUP relied on Klopotek's representations, and to IUP's

detriment, committed a substantial amount of financial and staff resources to Klopotek's System. Due to the deficient System Klopotek delivered, IUP has been forced to return its earlier, outdated systems, all while still paying for the System.

In addition to misrepresenting the System's functionality and capabilities, Klopotek omitted material information about the System's limitations. For instance, during the initial presentation and throughout contractual negotiations, Klopotek failed to mention or explain that the System's modules (business partners, contracts, production and editorial, etc.) did not integrate efficiently or share data across themselves. Although Klopotek's representations and demonstration suggested the modules would easily interact with one another, IUP's employees have been forced to dedicate a substantial amount of time to duplicate data entry into each module.

Klopotek also failed to disclose its overarching plan to move away from the Klopotek Classic Line (TMPM) platform—the System that Klopotek promoted and promised was capable of satisfying IUP's business needs. IUP invested hundreds of thousands of dollars into the System on the expectations that Klopotek would continue to fully support such platform for years to come. Instead, Klopotek has reduced its technical support of the System, including the number of software patches, which help maintain the System's functionality. In fact, during the presentations at the annual Klopotek Users Group meeting in October of 2018, Klopotek made clear that it would be implementing the new "STREAM" platform and encouraged IUP to upgrade. While IUP was led to believe throughout the onboarding stage in 2017 that Klopotek would continue to support the System, in reality, Klopotek was not transparent about the lifecycle of its product pool and sold IUP a soon-to-be unsupported platform.  This misrepresentation put IUP in the unwanted position of determining whether to stay with Klopotek's classic platform that IUP already invested significant resources towards or moving to the new STREAM platform that Klopotek plans to support for years to come.

Ultimately, Klopotek misrepresented that it could provide IUP with a fully functional System within a reasonable amount of time. Today, more than three years after the parties discussed and negotiated Klopotek's provision of the System, substantial flaws in the System's functionality remain. Klopotek made false promises about the System's functionality, knowing that some of its promises were false. This is evidenced, for example, by the fact that Klopotek failed to disclose it was moving to the "STREAM" modules and platform as it sold and implemented its expiring, classic platform to IUP.  IUP relied on Klopotek's original promises and representations, and committed a substantial amount of IUP's staff and financial resources to the now, inadequate System.

### III. Conclusion

IUP paid Klopotek to provide a functional System meeting the specifications set forth in the Agreement by July 2017, and Klopotek failed to deliver such a System. Please understand that IU is a public institution. In fact, IU is an instrumentality of the State of Indiana, funded with state appropriations (i.e., taxpayer dollars).  If Klopotek denies IU's request for reimbursement and IU files suit in Federal Court, we will seek a jury trial and pursue damages for Klopotek's misrepresentation in addition to all fees paid. We believe our claim would exceed $1,000,000. Given the circumstances, IU believes that jurors in Indiana would agree Klopotek should be held responsible for its misrepresentation and breach.

In conclusion, IU demands Klopotek reimburse IU the sum of $759,989.89 for Klopotek's breach of contract and misrepresentation in regards to the Klopotek System. In addition, IU demands that the name and logo of Indiana University and the IU Press be immediately removed from all Klopotek websites, customer and reference lists, and promotional or advertising materials. Representatives from IU's General Counsel office are willing to have a conference call or in-person meeting with Klopotek in Bloomington, Indiana, within the next thirty days in an attempt to avoid litigation. Please contact IU's Assistant General Counsel, Brandon Bekkering, to discuss IU's demand and a resolution.

Sincerely,

Brandon Bekkering
Assistant General Counsel

Cc:     Gary Dunham, Director, IU Press and Digital Publishing
        Tally Thrasher, Executive Director, Purchasing Services
        Mike Noth, Director of Business Affairs, Wells Library
        Jeff Goetz, Associate General Counsel, Office of the VP & General Counsel
        George Logan, VP of Sales and Marketing, Klopotek North America
        Ernst Lopes Cardozo, Chief Sales Officer, Klopotek

# EXHIBIT 5

| | |
|---|---|
| From: | Hetherington, David <D.Hetherington@klopotek.com> |
| To: | Thrasher, Tally; Noth, Michael S |
| Cc: | Carsten Gerlach |
| Subject: | Indiana - Klopotek Contract |

Sent:   Thu 6/16/2016 12:32 PM

✉ Message   📄 SAAS_PA_IUP_20160616.docx (179 KB)   📄 SAAS_IUP_20160616.docx (185 KB)

As promised in yesterday's email – attach is our first cut at the contract. There are two core documents attached with related appendices to follow on by COB on Tuesday, 6/21. Please review and if you have any immediate questions perhaps we can schedule a call on Wednesday or Thursday of next week.

If anything of immediate concern comes up please don't hesitate to contact me.

We are targeting to have everything completed so that we can launch the project on or about 8/1/2016.

The fast track approach – targeting signature by 6/30 is not necessary from our perspective.

Many thanks,


David M. Hetherington
EVP & COO
Klopotek North America
2001 Route 46 East
Parsippany, NJ 07054
(908) 458-5928 (m)
(862) 261-9402 (o)
(973) 710-9186 (f)
d.hetherington@klopotek.com
www.klopotek.com